**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **Batman Investments LLC, individually and on behalf of all others similarly situated,** | |
| **Plaintiff,** | |
| **v.** | **No. _____** |
| **Jerry Hostetter,** **Mir Jafer Ali Joffrey (a/k/a Buck Joffrey),** **Randall Leaman, and** **David Zook,** | **Jury Trial Demanded** |
| **Defendants.** | |

## CLASS ACTION COMPLAINT

Plaintiff, Batman Investments LLC, individually and on behalf of all others similarly situated, by and through its attorneys, brings this class action complaint against Jerry Hostetter, Mir Jafer Ali Joffrey, Randall Leaman, and David Zook.  Plaintiff alleges as follows:

## INTRODUCTORY STATEMENT

1.       This case concerns a $700,000,000 Ponzi scheme perpetrated by and through a series of investment funds, called the "Prestige Fund(s)," together with Paramount Management Group, LLC ("Paramount").  Defendants are owners and/or executives of the Prestige Funds and/or Paramount.

2.       The Prestige Funds raised money from thousands of retail investors.  The pitch was straightforward: investors' funds would be used to procure and operate a network of automated teller machines ("ATM(s)"), the revenues from which (earned primarily through use fees) would fund fixed monthly returns to investors.

1

3.     The Prestige Funds represented that they would accomplish their stated investment model by engaging Paramount, who, pursuant to agreements with the Prestige Funds, would procure the ATMs and manage the ATM portfolio.

4.     However, the Prestige Funds and Paramount were riddled with conflicts of interest stemming from common ownership and control by Defendants and by non-party Daryl Heller ("Heller," another owner/executive), who collectively grossly mismanaged the Prestige Funds and misappropriated investor monies for themselves.

5.     Despite purporting to manage a portfolio of approximately 38,000 ATMs, the Prestige Funds owned fewer than 10,000 ATMs, many of which were not even in operation, sitting in warehouses.

6.     Lacking meaningful cash flow from operations, the Prestige Funds relied on a constant influx of investor money to stay afloat to fund Ponzi payments to existing investors.

7.     Ultimately, Defendants' greed and mismanagement led to the Ponzi scheme's collapse.  The Prestige Funds and Paramount Management Group, LLC ceased making monthly payments to investors in or around April 2024, Heller's home was raided by FBI agents in December 2024, Heller filed for Chapter 11 bankruptcy in February 2025 estimating his liabilities were between $100,000,001 and $500,000,000, and the Prestige Funds' and Paramount's sham business relationship devolved into contentious litigation in the Court of Common Pleas of Lancaster County, Pennsylvania that resulted in the Prestige Funds obtaining a Consent Judgment and Order against Paramount for $138,156,118.38.

8.     As a result of the Prestige Funds' fraud and breaches of fiduciary duty to Plaintiff and the putative class (the "Class"), and Defendants' knowing substantial assistance thereof,

Plaintiff and Class have lost their principal investments and have not received their promised monthly distributions since April 2024.

## PARTIES AND RELEVANT NON-PARTIES

9.      Plaintiff Batman Investments LLC ("Plaintiff" and/or "Batman Investments") is a limited liability company organized under the laws of New Jersey.  Plaintiff's members are Vlad and Tatyana Detinich, who both reside in New Jersey.

10.      Defendant Jerry Hostetter ("Hostetter") is an individual who resides in Lancaster, Pennsylvania.

11.      Defendant Mir Jafer Ali Joffrey ("Joffrey") is an individual who resides in Santa Barbara, California.

12.      Defendant Randall Leaman ("Leaman") is an individual who resides in Leola, Pennsylvania.

13.      Defendant David Zook ("Zook") is an individual who resides in Lancaster, Pennsylvania.

14.      The nonparty "Prestige Fund(s)" referred to in this complaint are the following funds:

    a.      Prestige Fund A LLC;
    b.      Prestige Fund A II LLC;
    c.      Prestige Fund A IV LLC;
    d.      Prestige Fund A V LLC;
    e.      Prestige Fund A VI LLC;
    f.      Prestige Fund A VII LLC;
    g.      Prestige Fund A IX LLC;
    h.      Prestige Fund B LLC;
    i.      Prestige Fund B BTM I LLC;
    j.      Prestige Fund B II LLC;
    k.      Prestige Fund B IV LLC;
    l.      Prestige Fund B V LLC;

| m. | Prestige Fund B VI LLC; |
|----|----|
| n. | Prestige Fund B VII LLC; |
| o. | Prestige Fund D LLC; |
| p. | Prestige Fund D BTM I LLC; |
| q. | Prestige Fund D III LLC; |
| r. | Prestige Fund D IV LLC; |
| s. | Prestige Fund D V LLC; |
| t. | Prestige Fund D VI LLC; |
| u. | Prestige Fund E I LLC; |
| v. | WF Velocity Fund I LLC; |
| w. | WF Velocity Fund IV LLC; |
| x. | WF Velocity Fund V LLC; |
| y. | WF Velocity Fund VI LLC; and |
| z. | WF Velocity Fund VII LLC. |

15.     Each of the Prestige Funds was organized under the laws of Delaware and is headquartered at 415 North Prince Street, Suite 200, Lancaster, Pennsylvania 17603.

16.     Hostetter was an Executive Officer of each of the Prestige Funds with the exception of Prestige Fund D LLC.

17.     Joffrey was an Executive Officer of each of the Prestige Funds with the prefix "WF Velocity Fund."

18.     Zook was an Executive Officer of Prestige Fund A II LLC, Prestige Fund A V LLC, Prestige Fund A VI LLC, Prestige Fund A VII LLC, and all of the Prestige Fund D iterations.

19.     Each of the Prestige Funds was managed by one of the following entities (collectively, the "Prestige Fund Managers"):

| a. | Prestige Funds Management, LLC; |
|----|----|
| b. | Prestige Funds Management II, LLC; |
| c. | Prestige Funds Management III, LLC; and/or |
| d. | WF Velocity Funds Management, LLC. |

20.     Each of the Prestige Fund Managers was owned and controlled by one or more of the following:

| a. | Prestige Investment Group, which is owned by Hostetter; |
|----|----|
| b. | Heller Capital Group, LLC, which is owned by Heller; |

    c.      The Real Asset Investor LLC, which is owned by Zook; and/or

    d.      Vitruvian Group, LLC, which is owned by Joffrey.

21.      Accordingly, the Prestige Funds were ultimately owned and controlled by Heller and Defendants Hostetter, Joffrey, and Zook.

22.      Non-party Paramount Management Group, LLC ("Paramount") was organized under the laws of Pennsylvania and headquartered at 415 North Prince Street, Suite 202, Lancaster, Pennsylvania 17603 (the same address, but a different office suite, as the Prestige Funds).

23.      Heller, through Heller Capital Management, LLC, was the majority owner of Paramount. Accordingly, Heller maintained ultimate ownership and control over both the Prestige Funds and Paramount.

24.      Leaman was a minority owner of Paramount and served as Paramount's Chief Operating Officer ("COO") from 2011 until he was promoted to Chief Executive Officer ("CEO") in 2022.

## JURISDICTION AND VENUE

25.      This court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA") (codified at 28 U.S.C. § 1332(d)(2)). At least one member of the putative class is a citizen of a different state than at least one defendant, there are more than 100 putative class members, and the aggregate amount in controversy exceeds $5,000,000.

26.      This Court has personal jurisdiction over Defendants Hostetter, Leaman, and Zook because they each reside within the Commonwealth of Pennsylvania.

27.      This Court has personal jurisdiction over Defendant Joffrey pursuant to Pennsylvania's "Long-Arm" Statute, codified at Section 5322 of Title 42 of the Pennsylvania Consolidated Statutes Annotated, because Joffrey transacted business in Pennsylvania, caused

harm or tortious injury in Pennsylvania, and committed a violation within the jurisdiction of Pennsylvania, particularly the Pennsylvania Securities Act, as set forth herein.

28.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred herein.

## FACTUAL ALLEGATIONS

**I.      The Prestige Funds' fraud and breaches of fiduciary duty to Plaintiff and the Class**

      **A.      The Prestige Funds' investment model as represented to Plaintiff and the Class in the Prestige Funds' offering materials**

29.     The Prestige Funds utilized uniform and misleading offering materials to solicit and sell private placement securities to Plaintiff and approximately 2,700 other individuals and entities as set forth below.

30.     Between 2012 and 2024, the Prestige Funds raised over $700,000,000 from investors who were misled into believing that they were purchasing interests in an entity that would procure and manage ATM machines. In reality, these unwitting investors were purchasing interests in a Ponzi scheme that operated under the guise of an investment in the ATM industry.

31.     The Prestige Funds were headquartered in and operated out of Lancaster, Pennsylvania. Much of the solicitation activity used to sell the Prestige Funds, including developing offering materials and determining how and to whom those materials would be disseminated, occurred in Pennsylvania. All securities issued by the Prestige Funds were issued in the State of Pennsylvania to purchasers all over the country, including numerous purchasers in Pennsylvania. Decisions regarding the management of the Prestige Funds were made and carried out by some or all of the Prestige Fund's Executive Officers located in Pennsylvania.

32.     The Prestige Funds' Executive Officers Hostetter, Joffrey, and Zook were heavily involved in soliciting Plaintiff and other investors to invest in private placement investments in the Prestige Funds and were rewarded handsomely for their efforts. Upon information and belief, each of these individuals earned hundreds of thousands, if not millions, of dollars as a result of their involvement with the Prestige Funds.

33.     To facilitate these solicitation and sales efforts, the Prestige Funds, with the help of their Executive Officers Hostetter, Joffrey, and Zook, created and disseminated Private Placement Memoranda ("PPMs") that were provided to Plaintiff and members of the putative class prior to their purchase of an interest in the Prestige Fund. As the Prestige Funds were private placement securities, these PPMs were the only meaningful source of information available to Plaintiff and the class members in connection with their purchase decisions.

34.     While separate PPMs were used for different Prestige Funds, the PPMs were substantively identical in all or nearly all material respects.

35.     Plaintiff was given the Prestige Fund A VI PPM, dated May 17, 2022, which represented to investors that that the Prestige Funds would "make monthly distributions of capital derived from the operation of the Fund's ATMs." This statement was misleading because it omitted a crucial fact: that the monthly distributions could be funded by other sources, including capital contributions made by subsequent investors.

36.     The PPMs reiterated this same misstatement by again stating that "[d]istributions will be made through profits of the Fund derived through the Fund's ownership and operation of ATMs," omitting that, in reality, supposed profits included investors' capital contributions.

37.     The PPMs also stated that distributions "derived from the operations of the Funds' ATMs" would be paid at approximately $1,081 per month for every $52,000 invested, omitting

that at all times the Funds had insufficient ATM-derived revenue to support the promised distributions.

38.    Similarly, the PPMs also misrepresented that the Funds would "utilize the entirety of an Investors' capital to purchase, in the Fund's name, as many ATMs at it can." This was not true, as at all relevant times hereto the Funds were not purchasing anywhere close to the number of ATMs that investors' capital permitted.

39.    The PPM doubled down on this misstatement by promising that "[t]he Manager intends for the Fund to utilize the entirety of an Investor's proceeds to identify, acquire, manage, operate, and maintain new or used ATMs." Again, omitted from this statement was any statement that investors' proceeds would be, and fact were, used to fund purported distribution payments to prior investors.

40.    For all of these reasons, even the PPMs' core statement about the "intended business of the Fund—the purchase, operation, and maintenance of ATMs," was misleading. In short, the PPMs failed to disclose that their true "intended business" was operating a Ponzi scheme.

41.    The PPMs went on to state that the Prestige Funds would "utilize the services of an affiliate—Paramount Management Group, LLC, a Pennsylvania, member-managed limited liability company *("Paramount")*—or of third-party service providers to handle the installation, operation, and maintenance of the ATMs." (emphasis in original).

42.    To effectuate this, the Prestige Funds entered into ATM Management Services Agreements ("MSA(s)") with Paramount whereby the Prestige Funds purchased ATMs from Paramount using investor capital and, in turn, Paramount agreed to install, maintain, and manage the ATMs.

43.    The MSAs provided that Paramount would collect revenue generated by the ATMs—from, for example, use fees—and return to the Prestige Funds a fixed monthly amount.

44.    In reality, the Prestige Funds' Executive Officers knew that the line between Paramount's finances and those of the Prestige Funds was so blurred that it was non-existent. The PPMs did not disclose that Paramount's owners and management, including but not limited to non-party Heller, would be permitted to withhold amounts beyond those stated in the PPMs, including excessive sums retained as improper "owner draws" used to fund outlandish purchases and lifestyles. These improper draws and purchases had the effect of materially impacting and, in fact, eliminating Paramount's ability to pay amounts owed to the Prestige Funds and, in turn, their investors.

45.    As noted above, the PPMs went on to state that the Prestige Funds would make fixed monthly payments to investors in the amount of $1,081 per month for each $52,000 investment, or approximately 2% per month, with some variation upwards or downwards across the various Prestige Funds.  The monthly payments would last six or seven years (seven years in Plaintiff's case), designed to track the approximate lifespan of an ATM.

46.    The Prestige Funds also advertised that, in addition to receiving fixed monthly payments, investors could take advantage of tax benefits whereby investors were entitled to write off the depreciation of the ATMs.

47.    To solicit investors, the Prestige Funds also disseminated written cash-flow projections similar to the exemplar below:

**PFD ATM Portfolio Investment**

*Investment Cash Flows for Small/Mid Retail, Portfolio N*

Model Scenario: PFD, Fixed Rate of Portfolio N (INVESTOR)

**Assumptions:**

| | | |
|---|---|---|
| Investment per tranche | $ | 104,000 |
| Monthly Payout per tranche | $ | 2,125 |
| Margin per ATM Transactions | $ | 0.63 |
| Total Blended Transactions per month | | 3373 |
| Investment | $ | 104,000 |
| FMV of ATM @ EOC (7yr) | $ | 1,400 |

| Income | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | 7 Year Totals |
|---|---|---|---|---|---|---|---|---|
| ATM Surcharges | $ 25,500 | $ 25,500 | $ 25,500 | $ 25,500 | $ 25,500 | $ 25,500 | $ 25,500 | $ 178,499 |
| Proximity Marketing | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Total Income** | $ 25,500 | $ 25,500 | $ 25,500 | $ 25,500 | $ 25,500 | $ 25,500 | $ 25,500 | $ 178,499 |
| | | | | | | | | |
| **Expenses** | | | | | | | | |
| All inclusive agreement | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | | | |
| **Total Expense** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | | | |
| **Net Cash Flow** | $ 25,500 | $ 25,500 | $ 25,500 | $ 25,500 | $ 25,500 | $ 25,500 | $ 25,500 | $ 178,499 |
| Depreciation Impact (35%) | $ 7,280 | $ 7,280 | $ 7,280 | $ 7,280 | $ 7,280 | | | $ 36,400 |
| **Net Cash Flow with depreciation** | $ 32,780 | $ 32,780 | $ 32,780 | $ 32,780 | $ 32,780 | $ 25,500 | $ 25,500 | $ 214,899 |
| | | | | | | | | |
| **CoC Rate of Return** | 24.5% | 24.5% | 24.5% | 24.5% | 24.5% | 24.5% | 24.5% | |
| **CoC Rate of Return with Depreciation** | 31.5% | 31.5% | 31.5% | 31.5% | 31.5% | | | |
| **ROR adj for 104k investment** | 15.4% | 15.4% | 15.4% | 15.4% | 15.4% | 15.4% | 15.4% | 15.4% |
| **ROR adj for 104k investment w/out Dep** | 10.4% | 10.4% | 10.4% | 10.4% | 10.4% | 10.4% | 10.4% | 10.4% |

| | | |
|---|---|---|
| Payback in Years | 4.1 | |
| Payback in Years with Depreciation | 3.2 | |
| Projected FMV of ATMs/Inv at EOC (7 yr) | $ | 1,400 |
| Projected Depreciation @ 35% | $ | 36,400 |
| Annual Surcharge | $ | 25,500 |
| Annual Surcharge & Deprec (first 5yr) | $ | 32,780 |
| 7yr Surcharge Return | $ | 178,499 |
| 7yr Surcharge, Depreciation & FMV | $ | 216,299 |
| Net Gain (less Investment) | $ | 112,299 |
| ROI | 208.0% | |

48.    The above projection represented that an investor who invested $104,000 would receive a total return of $216,299 over the investment's seven-year term, amounting to an annual return of approximately 17.38%. Again, omitted from these projections was any reference to the fact that investors' capital was in reality a primary source of supposed revenue/income used to repay other investors.

**B.    Very few ATMs were actually purchased with investor capital**

49.    Unfortunately, very little investor capital was ultimately used to purchase ATMs.

50.    Rather, the Prestige Funds and Paramount have revealed in court filings that the Prestige Funds owned fewer than 10,000 ATMs, of which fewer than 1,000 were in operation, with thousands of ATMs sitting uninstalled in warehouses.

51.     Because the Prestige Funds did not procure nearly enough ATMs to generate meaningful revenue, they did not generate sufficient cash flow from operations to distribute to investors.

52.     Instead, the Prestige Funds relied on new investor capital to fund distributions to existing investors, in Ponzi-like fashion, and misappropriated investor capital to its principals, in particular, but without limitation, Heller and Leaman.

53.     In connection with litigation between the Prestige Funds and Paramount, the parties submitted stipulations about what certain of their employees, officers, and other witnesses would say if called to testify as live witnesses.  These stipulations revealed that the Prestige Funds did not procure or own the ATMs they purported to possess:

### *Matt Eby's stipulated testimony*

54.     Matt Eby ("Eby") was the Chief Financial Officer of Prestige Investment Group until at least late 2024.  Eby's stipulated testimony stated he "was responsible for receiving, reviewing, and reconciling data from Paramount for purposes of payments to the [Prestige Funds]."

55.     Eby also served as an Executive Officer several of the Prestige Funds alongside Hostetter, Joffrey, and Zook.

56.     Eby's stipulated testimony stated he would "receive Bills of Sale from Paramount" when the Prestige Funds purchased ATMs from Paramount.

57.     However, Eby's stipulated testimony further stated that "[t]hroughout 2023 and 2024, several of the [Prestige Funds] remitted sums to Paramount to purchase additional ATM Units" but "[b]efore December 27, 2024, Paramount had not sent Bills of Sale to Mr. Eby or [the Prestige Funds] for those 2023 and 2024 purchases."  Eby stated that "the additional sums remitted

to Paramount in 2023 and 2024 for which [the Prestige Funds] did not receive Bills of Sale should have purchased approximately 8025 ATM units."

58.     Accordingly, for at least a year during the 2023-2024 time period, the Prestige Funds knew they were remitting investor funds to Paramount to procure ATMs, but the ATMs were not being purchased.

59.     Eby's stipulated testimony further stated that "[i]n total, based on Bills of Sale provided by Paramount from the beginning of [the Prestige Funds'] investments with Paramount to December 27, 2024, Mr. Eby calculates that the [Prestige Funds] purchased 38,561 ATM Units."

60.     Eby's stipulated testimony further stated that, pursuant to the MSAs between the Prestige Funds and Paramount, "Paramount should have put all 38,561 ATMs purchased by the [the Prestige Funds] in active service at the latest by early 2024, and the bulk of the ATMs should have been online and active well before 2024."

61.     Eby's stipulated testimony further stated that "by email dated February 24, 2024 . . . Heller sent Mr. Eby an email report that Mr. Eby understood as showing the total number of [the Prestige Funds'] ATMs online and the gross financial performance of each by certain market categories . . . the report shows 34,284 ATMs, which Mr. Eby understood to represent ATMs all belonging to [the Prestige Funds]."

### *Leigh Danca's stipulated testimony*

62.     Leigh Danca ("Danca") was the Vice President of Information Systems at Paramount until at least December 2024.  Danca's stipulated testimony was that she "was familiar with the ATM assets that Paramount managed, including the number of ATMs managed."

63.    Danca's stipulated testimony stated that Paramount had never managed 38,000 ATMs for the Prestige Funds and that instead it managed only 8,000 ATMs for the Prestige Funds "at most."

64.    Specifically, Danca's stipulated testimony was that "[d]uring [her] tenure at Paramount, she never saw 38,000 ATMs owned, managed, or otherwise on the Paramount network" and that "[a]t most, Paramount had 8,000 Paramount-owned ATMs that were on the network." Danca clarified that "Paramount-owned ATMs" included any ATMs owned by the Prestige Funds.

### *Brent Bauman's stipulated testimony*

65.    Brent Bauman ("Bauman") is an industry expert whose stipulated testimony analyzed the ATMs owned and managed by the Prestige Funds and Paramount.

66.    Bauman's stipulated testimony stated: "[o]n December 10, 2024, Paramount executed an assignment of approximately 10,000 ATMs to [the Prestige Funds] . . . Of the approximately 10,000 ATMs, roughly half were Paramount-owned and half were affiliate-owned, meaning at the time of assignment, [the Prestige Funds] could have owned and operated outright approximately 5,000 ATMs, with the remaining ATMs having only certain processing rights available to the [Prestige Funds]."

67.    Bauman's stipulated testimony further stated: "[o]f the ATMs assigned, the ownership of nearly 6700 of them is contested by one or more third parties, meaning those parties claim that they, in fact, own the ATMs, and not [the Prestige Funds]."

68.    Bauman's stipulated testimony further stated that the Prestige Funds did not procure until December 27, 2024 "acquisition contracts" indicating "the terms under which Paramount acquired certain ATMs that were later sold to the Plaintiffs when the Plaintiffs were initially

investing funds with Paramount." Bauman's stipulated testimony stated that "These contracts were material because several third parties have claimed rights of ownership in the assigned ATMs, chiefly under the terms of the acquisition contracts."

69.    Bauman's stipulated testimony further stated: "[o]f the ATMs assigned where ownership is not contested, only approximately 975 could be wholly owned by the [Prestige Funds]." Bauman "conservatively estimate[d]" that "[the Prestige Funds] might, at most, receive revenue from perhaps several hundred ATMs."

70.    Bauman's stipulated testimony further stated: "[t]o date, [the Prestige Funds] have received no income streams from the assigned ATMs. This is chiefly the case because the processors, who remit the sums earned from the assigned ATMs, have so far refused to transmit sums earned by the ATMs given the various disputes over ownership."

71.    Bauman's stipulated testimony further stated: "[f]rom December 10, 2024 to the present, Mr. Bauman has had contact with numerous vendors, locations, processors, and assorted third parties regarding the assigned ATMs. Those parties have overwhelmingly conveyed to Mr. Bauman that Paramount owed them significant sums of money related to the assigned ATMs. By way of just one example, one cellular modem company told Mr. Bauman's team that it hadn't been paid in seven months and had, consequently, turned off the modems, impacting nearly 300 ATMs."

**C.    The lack of an adequate and producing portfolio of ATMs led to substantial cash flow shortfalls**

72.    The court-appointed examiner (the "Examiner") in Heller's bankruptcy conducted an examination into "the allegation that [Heller] operated a Ponzi scheme" reviewing, amongst other things, First National Bank monthly account statements for Paramount, Heller Capital Group, and Prestige Investment Group, LLC, profit reports, correspondence between Heller and Leaman, as well as conducting interviews of Hostetter, Heller, Eby, and others.

73.    With respect to the ATMs themselves, the Examiner found that Paramount "should have been able to purchase roughly 33,898 ATMs with the $587,562,603 received from" the Prestige Funds from January 2021 through March 2025 (the Examiner's "Review Period").

74.    However, the Examiner found that "the highest single monthly ATM count reflected in the Gross Profit Reports was 17,179 in July 2023.

75.    As for whether such deficient ATM holdings were sufficient to sustain Paramount's operations, including distributions to investors, the Examiner found that, during the Review Period, Paramount had just $38,162,066 in net operating cash which "was insufficient to pay the aggregate $407,324,116 in distributions [Paramount] paid to Investors during the Review Period."

76.    Moreover, the Examiner found that even Paramount's "$161,663,196 in *gross* receipts from ATM operations was insufficient to pay the $407,324,116 in returns to Investors during the Review Period." (emphasis in original).

77.    Accordingly, the Examiner found "[w]ith no other available funds to pay returns to earlier Investors, [Paramount] necessarily used funds from subsequent Investors to pay returns owed to earlier Investors."

**D.    Heller and Leaman played "shell games" to cover Paramount's losses and Defendants misappropriated investor funds for their own benefit**

78.    In a brief Heller filed in his bankruptcy proceedings, Heller, through his attorneys, represented that "Prestige Funds has been paid back approximately $400 million in recent years, which does not even reflect the total amount paid back to Prestige since the inception of the funds in 2012.  In that same period, Prestige Fund managers have siphoned approximately $70 million into their management funds which they own, of which the majority of this amount has been egregiously paid to said managers over this period."

79.     Upon information and belief, the "management funds" Heller referred to are the Prestige Fund Managers owned by Zook, Hostetter, and, ironically, Heller.

80.     In addition to the Prestige Fund Managers funneling investor money to themselves, Leaman and Heller used investor money siphoned to Paramount to fund lavish purchases.

81.     Leaman, who drew a $350,000 salary as Paramount's CEO, also took numerous "ownership draws," including to purchase a beach vacation home in New Jersey.

82.     Leaman and Heller also used Paramount funds to purchase luxury vehicles including an Audi RS7, a Cadillac SUV, a Ferrari, and a Mercedes that Leaman "purchased" from Paramount for just $1.

## II.    Defendants had actual knowledge of, and substantially assisted in, the fraud and breaches of fiduciary duty described herein

### A.    Defendants Hostetter, Joffrey, and Zook solicited investors and spearheaded capital raising efforts for the Prestige Funds

#### *Defendant Zook*

83.     Zook is the Founder and CEO of The Real Asset Investor, LLC ("The Real Asset Investor"). According to its website, "therealassetinvestor.com," The Real Asset Investor "is an investment and syndication firm that focuses on providing high yield investment opportunities to its investors by partnering with best-in-class operators across a variety of asset classes."

84.     One of the "opportunities" Zook offered to his network of followers was the Prestige Funds.

85.     However, Zook's role was more than mere independent promoter of the Prestige Funds. Rather, Zook was an Executive Officer of many of the Prestige Funds and The Real Asset Investor had an ownership stake in some of the Prestige Fund Managers.

86.     Zook's biography on "prestigefundd.com" stated that "[Zook] serves as the Executive Vice President of Development at Prestige Fund D where he and his team manages Investor Relations and Finance."

87.     Through Zook's ownership and control stake in the Prestige Funds and the Prestige Fund Managers, Zook gained knowledge of the Prestige Fund's operations, including the use (and misuse) of investor capital and the true extent (or lack thereof) of the Prestige Funds' ATM portfolio.

88.     Zook substantially assisted the Prestige Funds' fraud and breaches of fiduciary duties by developing and implementing strategies for selling Prestige Fund investments to retail investors, including by developing and disseminating marketing materials and conducting investment presentations, webinars, and seminars across the country.

89.     Zook also regularly emailed his investor network pitching the Prestige Funds.

90.     Zook also engaged registered investment advisory firms ("RIAs") to sell Prestige Fund investments to the RIAs' clients.  For example, Zook paid an RIA called High Speed Alliance to sell Prestige Fund investments to High Speed Alliance's clients, including Plaintiff, as well as an RIA called Dew Wealth Management, LLC, to do the same.

91.     Notably, this was not Zook's first time promoting a Ponzi scheme.  Zook advertised that his company has promoted "ten different asset classes."  At least two of those "asset classes" were Ponzi schemes.

92.     Specifically, Zook was previously a major promoter of the Clean Energy Technology Association ("CETA"), a Ponzi scheme shut down by the Securities and Exchange Commission ("SEC") in May 2023.  In connection therewith, Zook falsely told prospective CETA investors that CETA developed a patented method for refining coal and had struck a deal to sell

one of its products to Exxon Mobil. There was in fact no Exxon Mobil contract, nor had CETA developed the products it promoted to investors.

93.    A federal judge ultimately appointed a receiver to take control of CETA's assets, and the receiver determined that CETA was operating a Ponzi scheme that caused investors to lose $181 million.

94.    According to the receiver's counsel, Zook netted $7.2 million in connection with his role as a promoter of the CETA Ponzi scheme.

95.    Zook also assisted many investors, including Plaintiff, in securing loans to fund portions of their investments by arranging for certain banks with whom Zook had a close relationship to lend money to Prestige Fund investors.

96.    Once such bank was UniBank, a Lynwood, Washington-based bank with which Zook arranged to provide loans to Prestige Fund investors.

97.    Zook's relationship with UniBank stretches at least as far back as Zook's role in the CETA Ponzi scheme, which actually overlaps with Zook's activities raising capital for the Prestige Funds. UniBank is currently a Defendant in a lawsuit filed by CETA investors alleging UniBank issued loans to finance CETA investors' investments and "ignored obvious signs of fraud that should have been enough to stop any loans from being made."

98.    Another such bank was Mid Penn Bank, a Millersburg, Pennsylvania-based bank. Zook maintained a professional relationship with a Mid Penn Bank banker to whom Zook would refer prospective Prestige Fund investors to secure a loan.

99.    Upon information and belief, Zook was himself a significant Mid Penn Bank customer prior to Mid Penn Bank's extension of loans to Prestige Fund investors.

100.    Both banks collected significant interest and other fees from these relationships, including by requiring borrowers to open deposit accounts at the banks.

101.    Zook's efforts to promote the Prestige Funds and raise investor capital substantially assisted the Prestige Funds' fraud and breaches and fiduciary duty, which relied on a constant influx of new investor capital to fund Ponzi payments to existing investors, to fund misappropriations of funds for the Prestige Funds' and Paramount's principals' personal benefit, and to fund Paramount's shuffling of money to cover mounting shortfalls caused by the ATM portfolio's inability to generate meaningful cash flow from operations.

### Buck Joffrey

102.    Joffrey is a former medical doctor who now runs an investor club called Wealth Formula, through which Joffrey offers access to "invest alongside with me in some of the projects that I am looking at and even in some of my own deals," according to Wealth Formula's website, "wealthformula.com."

103.    Joffrey did not remain an independent promoter of the Prestige Funds.  Rather, Joffrey served as an Executive Officer of many of the Prestige Funds and had an ownership stake in the Prestige Fund Managers.

104.    Through Joffrey's ownership and control stake in the Prestige Funds and the Prestige Fund Managers, Joffrey gained knowledge of the Prestige Fund's operations, including the use (and misuse) of investor capital and the true extent (or lack thereof) of the Prestige Funds' ATM portfolio.

105.    In addition, Joffrey's brother, Zulfe Ali ("Ali") and Ali's SEC-registered broker-dealer, Velerity Group, Inc., created and disseminated materials to Prestige Fund investors claiming to have conducted due diligence on the Prestige Funds including, but not limited to,

industry research, review of Prestige Fund financials, review of Paramount's operations, and meetings with Prestige Funds' and Paramount's principals. Joffrey represented to investors that he was involved in and had knowledge of the due diligence conducted by his brother, Ali. Through this due diligence process, Joffrey gained further knowledge of the Prestige Fund's operations, including the use (and misuse) of investor capital and the true extent (or lack thereof) of the Prestige Funds' ATM portfolio.

106.    Joffrey raised money for Prestige Fund offerings by developing and disseminating marketing materials and conducting investment presentations, webinars, and seminars across the country.

107.    Joffrey's efforts to promote the Prestige Funds and raise investor capital substantially assisted the Prestige Funds' fraud and breaches and fiduciary duty, which relied on a constant influx of new investor capital to fund Ponzi payments to existing investors, to fund misappropriations of funds for the Prestige Funds' and Paramount's principals' personal benefit, and to fund Paramount's shuffling of money to cover mounting shortfalls caused by the ATM portfolio's inability to generate meaningful cash flow from operations.

### Jerry Hostetter

108.    Hostetter is a longtime Pennsylvania-based businessman who co-founded Prestige Investment Group (which has an ownership stake in the Prestige Fund Managers) with Heller and served as the President thereof.

109.    Hostetter also served as Executive Officer of most of the Prestige Funds.

110.    Through Hostetter's ownership and control stake in the Prestige Funds and the Prestige Fund Managers, Hostetter gained knowledge of the Prestige Funds' operations, including

the use (and misuse) of investor capital and the true extent (or lack thereof) of the Prestige Funds' ATM portfolio.

111.    Hostetter participated in fundraising efforts by developing and implementing strategies for selling Prestige Fund investments to retail investors including by developing and disseminating marketing materials and conducting investment presentations, webinars, and seminars across the country.

112.    Hostetter's efforts to promote the Prestige Funds and raise investor capital substantially assisted the Prestige Funds' fraud and breaches and fiduciary duty, which relied on a constant influx of new investor capital to fund Ponzi payments to existing investors, to fund misappropriations of funds for the Prestige Funds' and Paramount's principals' personal benefit, and to fund Paramount's shuffling of money to cover mounting shortfalls caused by the ATM portfolio's inability to generate meaningful cash flow from operations.

### B.    Defendant Leaman substantially assisted Heller in the misuse of investor capital

113.    In addition, Leaman, who gained access to and knowledge of Paramount's books and records as Paramount's CEO and before that as COO, assisted Heller in moving money around to cover Paramount's mounting shortfalls.  As a product of Leaman's role in Paramount and relationship to Heller, Leaman gained actual knowledge of Paramount's operations vis-à-vis the Prestige Funds, including the use (and misuse) of investor capital and the true extent (or lack thereof) of the Prestige Funds' ATM portfolio.

114.    Leaman substantially assisted Heller's and Paramount's misuse of investor funds provided to Paramount by the Prestige Funds.

115.    In addition, Leaman was instrumental in managing Paramount's banking relationship with First National Bank, the primary financial institution at which Paramount held

funds between 2017 and 2024. During that period, Paramount held at least four different bank accounts at First National Bank through which the Ponzi scheme was operated.

116.    Leaman also substantially assisted Paramount with its relationship with Pathward, N.A., formerly MetaBank, N.A. ("Pathward").    Paramount served as independent sales organization ("ISO") for ATMs owned by the Prestige Funds to enable those ATMs to settle transactions.  This required a relationship with Pathward, acting as the sponsoring bank, which permitted Paramount to gain access to electronic payment networks for those transaction settlements.

117.    Leaman texted Heller on nearly a daily basis regarding Paramount's expenditures, bank account balances, and other financial matters.

118.    From time to time, Leaman provided color-coded charts to Heller indicating which invoices Leaman believed Paramount could avoid paying without meaningful consequences.

119.    In 2024, Leaman assisted Heller in disposing of unused ATMs in the Prestige Funds' portfolio.  An August 29, 2024 text exchange between Leaman and Heller went as follows:

> **Leaman:** We've been throwing away ATMs at the warehouse. Should we stip [sic]?
>
> **Heller:** When you say throwing something away, you're getting scrap metal costs?  Yes, I think we should stock until this calms has [sic] some of these are tied to non-depreciation funds.  Do you have any idea how many we got rid of?
>
> **Leaman:** We found someone to haul away for free.

120.    This exchange not only indicates that some of the Prestige Funds' ATMs were rotting away in warehouses, but also that Paramount was disposing of them to free up capital to cover its ballooning obligations to the Prestige Funds (and, in turn, the Prestige Funds' investors) and others.

### III.    Plaintiff's Prestige Fund investment

121.    In or around October 2022, Plaintiff invested $2,080,000 in Prestige Fund A VI, LLC.

122.    The representations this specific Prestige Fund made to Plaintiff were largely no different than those made by the other Prestige Funds including, but not limited to: that (1) Prestige Fund A VI would use investor capital to purchase ATMs from Paramount; (2) Paramount would manage those ATMs to generate revenue; (3) Paramount would collect revenue from the ATMs and pay a fixed monthly sum to Prestige Fund A VI, LLC; (4) Prestige Fund A VI would distribute the money earned to its investors.[1]

123.    Zook's company, The Real Asset Investor, LLC, recommended Plaintiff obtain a loan from UniBank to leverage his investment.  However, by approximately October 2022 (prior to Plaintiff's investment), Plaintiff learned that UniBank was no longer willing to loan money to invest in the Prestige Funds.

124.    On October 19, 2022, a The Real Asset Investor, LLC employee, Cordell Beiler, told Plaintiff "Brett informed me that you are searching for an alternative leveraging option for our ATM Fund.  I am just reaching out to check on your status, and to see if you require anything from our end."

125.    Plaintiff responded the same day: "Yes, I am still interested.  Do you have any other banks that I can use besides Unibank?"

---

[1] To be sure, there is a technical difference between, on the one hand, the "Prestige Fund A" series of investments, and on the other hand, most (if not all) of the other Prestige Funds: the Prestige Fund A series' offering documents purported to offer investors direct ownership in the ATMs, rather than simply ownership in the Prestige Funds.  In practice, however, this technical difference has little consequence because the parties' rights and obligations to one another remained the same.

126.    Cordell responded the same day: "Yes, I'd like to introduce you to Heather and Heidi from Mid Penn Bank who can assist you with obtaining financing for an ATM investment," copying Heather Hall and Heidi Lautenslager, two Mid Penn Bank bankers, on the email.

127.    Hall and Lautenslager proceeded to assist Plaintiff in obtaining a loan of $1,560,000 to finance his Prestige Fund investment.  Along with $520,000 of Plaintiff's own capital, Plaintiff invested a total of $2,080,000 in Prestige Fund A VI.

128.    In or around April 2024, the Ponzi scheme collapsed because the Prestige Funds ran out of money to continue operating and funding Ponzi payments to investors.

129.    In the months that followed, Heller stalled and delayed payment to investors and Paramount and the Prestige Funds, who shared common ownership, began infighting, trying to blame one another for the businesses' collapse.

130.    Unfortunately, Plaintiff and the Class have not received monthly payments since approximately April 2024 and Plaintiff and the Class have lost their principal investments.

## CLASS ACTION ALLEGATIONS

131.    Plaintiff brings this action against Defendant pursuant to Rules 23(a) and 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of itself and all other persons similarly situated.  The Class which the Plaintiff seeks to represent is comprised of all persons who:

    a.    Purchased investments in Prestige Funds between April 13, 2017 and December 31, 2024;

    b.    Did not make a net profit on their investments; and

    c.    Have never been owners, employees, legal representatives, or successors of the Prestige Funds or Paramount.

(the "Class Definition").

132.    Plaintiff reserves the right to amend this Complaint to assert claims on behalf of additional classes or subclasses of investors in any of the Prestige Funds as may later become necessary, insofar as the misrepresentations and omissions identified in this complaint were common to all Prestige Fund offerings.

133.    **Numerosity and superiority:** Approximately 2,700 individuals or entities fall within the proposed Class Definition.  As a result, a class action is superior to other methods of adjudicating the claims of the putative class members; litigating their claims individually would be impractical. Additionally, the disposition of the claims in a class action will provide substantial benefit to the parties and the Court in avoiding a multiplicity of identical suits and inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party defending the claims.

134.    The claims of Plaintiff are typical of the claims of the Class it seeks to represent. Plaintiff and other Class members invested in one or more of the Prestige Funds during the relevant time period. All of their purchases were based on the same set of offering documents and other information made available by the Prestige Funds and their affiliates.  A material misrepresentation or omission to one investor is thus the same for all investors.

135.    **Commonality and predominance:** There are well-defined, nearly identical issues common to the Class—which predominate over issues not common to the class—including:

    a.    Whether the Prestige Funds operated a Ponzi scheme;

    b.    Whether certain representations common across the Prestige Funds including, but not limited to, the list below were false and misleading:

        1.    the Prestige Funds could generate double-digit annualized returns;

    2.    the Prestige Funds would use investors' capital to purchase as many ATMs as possible;

    3.    investors would receive returns comprised of revenue from ATMs; and

    4.    Paramount would only realize income for its services as described in the PPMs.

c.    Whether Defendants knew that the representations common among the Prestige Funds were false and/or misleading;

d.    Whether the misleading statements made by the Prestige Funds were material; and

e.    Whether the Prestige Funds' misrepresentations and omissions—such as that the Prestige Fund investments were profitable—were relied upon by any individual who purchased those investments.

136.    These and other common issues predominate over any individual issues. The focus of these claims is on the conduct of the Prestige Funds and the contents of their offering documents and other public statements, which did not vary as between class members. Resolution of these common questions will drive the claims of all Class members toward judgment or resolution; they involve a "fatal similarity" for purposes of the claims of all class members.

137.    For all of these reasons, a class action is the superior method for the fair and efficient adjudication of this controversy.

138.    **Typicality:** Like all of the proposed Class members, Plaintiff seeks to recover the financial losses he suffered because of the Prestige Funds' misrepresentations regarding the investment.

139.    **Adequacy of representation:** Plaintiff is a member of the Class and will fairly and adequately represent and protect its interests.  Plaintiff has no interests contrary to or in conflict with the interests of other class members.

140.    Counsel for Plaintiff are competent and experienced attorneys.

141.    **Risk of inconsistent or impeding adjudications:** Prosecuting separate actions by individual Class members would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for at least one party opposing the class.

142.    Moreover, adjudications with respect to individual Class members would, as a practical matter, substantially impair the ability of other members to protect their interests because of the limited assets that may be available to remedy harms done to Plaintiff in this case.

143.    Class-wide relief is essential to resolve the claims regarding all potential investors relating to all responsible parties in an equitable, even-handed fashion.

144.    Plaintiff therefore seeks certification of the Class(es) pursuant to Rules 23(b)(1)(A) and (b)(3).

## CAUSES OF ACTION

### Count I
### Violation of Pennsylvania Securities Act § 1-401(b) and § 1-503(a)
### (Against All Defendants except Leaman)

145.    Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

146.    The Prestige Funds solicited investments from Plaintiff and Class Members through the preparation and dissemination of uniform PPMs that were misleading because they contained untrue statements of material fact and omitted material facts necessary to make the statements made not misleading, in violation of 70 P.S. § 1-401(b) of the Pennsylvania Securities Act of 1972.

147.    Upon information and belief, each investor in the Prestige Funds received substantially identical Private Placement Memoranda (PPMs), subscription agreements, and related marketing materials. These offering documents uniformly represented that monthly

distributions would be derived from ATM operations and failed to disclose that distributions were instead made using new investor capital.

148.    The misstatements and omissions in the PPMs were not tailored to individual investors but were part of a standardized set of materials used to solicit investments from the public, ensuring that all investors were exposed to the same materially misleading statements and omissions.

149.    Among other things, the PPMs falsely represented that monthly distributions to investors would be derived from revenue generated by the operation of ATMs, omitting the crucial and material fact that the Prestige Funds at all times lacked the revenue to fund distributions as promised and thus turned to new investor capital to fund distributions—a classic Ponzi scheme.

150.    Further, the PPMs promised that the Prestige Funds would "utilize the entirety of an Investor's proceeds to identify, acquire, manage, operate, and maintain new or used ATMs." Omitted from this statement was that investors' proceeds would be, and in fact were, used to fund purported distribution payments to prior investors.

151.    The PPM also omitted material facts about the supposed legitimacy of the Prestige Funds' relationship with Paramount.

152.    Defendants directly and/or indirectly controlled the Prestige Funds that committed the aforementioned violations of § 1-401(b). These executive Defendants were officers, founders, and/or managing members with the power to influence and direct the operations and statements of the Prestige Funds. Defendants are therefore liable as control persons under 70 P.S. § 1-503(a).

153.    As a result of these material misstatements and omissions, Plaintiff and the Class have suffered damages and are entitled to rescission and/or damages under 70 P.S. § 1-501(a), jointly and severally against the Defendants.

**Count II**
**Aiding and Abetting Fraud**
**(against all Defendants)**

154.    Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

155.    The Prestige Funds defrauded Plaintiff and other members of the putative class by making misrepresentations in the Prestige Funds' offering documents that, without limitation, Plaintiff's funds would be used to purchase and manage ATMs.  In reality, the Prestige Funds purchased and managed very few ATMs, which drove the Prestige Funds to misuse investor funds to cover payments to existing investors in Ponzi like fashion, amongst other misuses detailed herein.

156.    The Prestige Funds omitted material facts necessary to make the statements in the Prestige Funds' offering documents not misleading.  Such material facts included that the Prestige Funds were operating a Ponzi scheme and that investor money was being misappropriated by Paramount's officers for their personal benefit.

157.    Such misstatements and omissions were material.

158.    Plaintiff and the Class justifiably relied upon the misstatements and omissions described herein when purchasing their investments in the Prestige Funds.

159.    Defendants, as a byproduct of, without limitation—(1) Hostetter's, Joffrey's, and Zook's roles as Executive Officers of the Prestige Funds; (2) Joffrey's due diligence conducted on the Prestige Funds; (3) Hostetter's, Joffrey's, and Zook's ownership and control over the Prestige Fund Managers; and (4) Defendant Leaman's role as COO and CEO of Paramount and ownership and control thereof—had actual knowledge that the Prestige Fund offering documents contained

material misrepresentations and omissions intended to mislead investors into purchasing the investments issued by the Prestige Funds.

160.    Defendants Hostetter, Joffrey, and Zook substantially assisted the Prestige Funds' fraud by serving as Executive Officers of the Prestige Funds with the ability to control the Prestige Funds' operations.

161.    Defendants Hostetter, Joffrey, and Zook also substantially assisted the Prestige Funds' fraud by raising substantial capital for the Prestige Funds.

162.    Defendant Leaman substantially assisted the Prestige Funds fraud by serving as Paramount's COO and CEO and assisting Heller in, amongst other things, misusing investor capital to cover mounting losses.  Leaman also misappropriated investor funds for his own personal benefit.

## Count III
### Aiding and Abetting Breach of Fiduciary Duty
### (against all Defendants)

163.    Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

164.    At all relevant times, the Prestige Funds owed a fiduciary duty to Plaintiff and the Class because the Prestige Funds purported to have expertise in the investments they sold to Plaintiff and the Class, because the Prestige Funds understood that Plaintiff and members of the Class did not have such expertise, and because the Prestige Funds solicited and held Plaintiff's and the Class' investment monies purportedly for Plaintiff's and members of the Class' benefit.  Such fiduciary duties included the duty to act in Plaintiff's and the Class' best interests.

165.    The Prestige Funds breached their fiduciary duties to Plaintiff and the Class by failing to act in Plaintiff's and the Class' best interests.

166.    Defendants, as a byproduct of, without limitation—(1) Hostetter's, Joffrey's, and Zook's roles as Executive Officers of the Prestige Funds; (2) Joffrey's due diligence conducted on the Prestige Funds; (3) Defendants Hostetter's and Zook's ownership and control over the Prestige Fund Managers; and (4) Defendant Leaman's role as COO and CEO of Paramount and ownership and control thereof—had actual knowledge that the Prestige Funds were not acting in Plaintiff's or the Class' best interest by misusing investor capital.

167.    Defendants Hostetter, Joffrey, and Zook substantially assisted the Prestige Funds' fraud by serving as Executive Officers of the Prestige Funds with the ability to control the Prestige Funds' operations.

168.    Defendants Hostetter, Joffrey, and Zook also substantially assisted the Prestige Funds' fraud by raising substantial capital for the Prestige Funds.

169.    Defendant Leaman substantially assisted the Prestige Funds fraud by serving as Paramount's COO and CEO.  In these roles, Leaman assisted Heller in, amongst other things, misusing investor capital to cover mounting invoices.  Leaman also misappropriated investor funds for his own personal benefit.

## Count IV
### Violation of Pennsylvania Securities Act § 1-201
### (against Defendants Hostetter, Joffrey, and Zook)

170.    Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

171.    It is a violation of 70 P.S. § 1-201 of the Pennsylvania Securities Act for any person to offer or sell securities in Pennsylvania unless the securities are registered under the Act, or the securities are exempt from registration.

172.    The Prestige Fund investments that Defendants Hostetter, Joffrey, and Zook offered and sold to Plaintiff and the Class were securities.

173.    The Prestige Fund investments that Defendants Hostetter, Joffrey, and Zook offered and sold to Plaintiff and the Class did not qualify for exemption under 70 P.S. § 1-203(d) or § 1-203(e) because the Prestige Funds engaged in general solicitation, marketing and advertisement both directly by Hostetter, Joffrey, and Zook to their followers and through the Prestige Fund's website, prestigefundd.com, which was recently deactivated.

174.    P.S. § 1-203(t) of the Act exempts securities sold only to accredited investors and sold in good faith reliance that the offering would qualify for an exemption from registration under section 5 of the Securities Act of 1933 (the "Securities Act"), section 3(a)(11) of the Securities Act, or section 3(b) of the Securities Act.

175.    Each of the Prestige Funds purported to qualify for exemption under the federal securities laws by filing a Form D Notice of Exempt Offering of Securities ("Form D(s)") with the SEC and indicating the Prestige Funds were being sold pursuant to either Rule 506(b) or Rule 506(c) of Regulation D of the Securities Act.

176.    Despite filing individual (and sometimes multiple) Form Ds in connection with each of the Prestige Funds' offerings, the investments issued by the Prestige Funds constituted a single integrated offering of securities because there were no significant differences across the Prestige Funds in the offer or sale of securities.

177.    Moreover, the Prestige Fund offerings were integrated because the offerings were part of a single plan of financing and were made for the same general purpose.

178.    This integrated offering did not meet the criteria for exemption from registration under Rule 506(b) because the Prestige Funds engaged in general solicitation, marketing and advertisement as described above.

179.    This integrated offering also did not meet the criteria for exemption from registration under Rule 506(b) because it was sold to more than 35 non-accredited investors.

180.    This integrated offering did not meet the criteria for exemption from registration under Rule 506(c) because the Prestige Funds did not verify that all investors were accredited, and indeed, they sold investments to non-accredited investors.

181.    Even if the Prestige Funds met the federal exemption requirements, the Prestige Funds' offering materials still failed to qualify for exemption under P.S. § 1-203(t) because they failed to include a legend on the cover page disclosing the information required for exemption §1-203(t)(viii).

182.    The Pennsylvania Securities Act sets forth a variety of other exempt securities and securities transactions.  To the extent not discussed above, the investments issued by the Prestige Funds did not qualify for any of the exemptions offered under the Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

a.      Award compensatory damages to Plaintiff in the amount of $700,000,000, for which Defendants are jointly and severally liable;

b.      Award pre- and post-judgment interest at the legal rate; and

c.      Grant Plaintiff whatever other relief is just and proper.

### JURY TRIAL DEMANDED

August 27, 2025

Respectfully Submitted,

/s/ Alex E. Rogers
_____
Alex E. Rogers (ID #71043)
425 New Commerce Boulevard
Wilkes-Barre, PA 18706
(T): 570-262-8250
arogers@bedwickandjones.com

Jason J. Kane (will seek *pro hac vice*)
**PEIFFER WOLF CARR KANE
CONWAY & WISE LLP**
160 Linden Oaks
Rochester, NY 14625
(T) 585-310-5140
jkane@peifferwolf.com

Daniel Centner (will seek *pro hac vice*)
**PEIFFER WOLF CARR KANE
CONWAY & WISE LLP**
935 Gravier Street, Suite 1600
New Orleans, LA 70112
(T) 504-605-2234
dcentner@peifferwolf.com

Nico Banks (will seek *pro hac vice*)
**BANKS LAW OFFICE**
1121 SE Sherman St., Unit A
Portland, OR 97214
(T) 971-678-0036
nico@bankslawoffice.com

Scott Silver (will seek *pro hac vice*)
**SILVER LAW GROUP**
11780 W. Sample Road
Coral Springs, FL 33065
(T) 954-755-4799
ssilver@silverlaw.com

Ryan Schwamm (will seek *pro hac vice*)
**SILVER LAW GROUP**
11780 W. Sample Road
Coral Springs, FL 33065
(T) 954-755-4799
rschwamm@silverlaw.com

Peter Spett (will seek *pro hac vice*)
**SILVER LAW GROUP**
11780 W. Sample Road
Coral Springs, FL 33065
(T) 954-755-4799
pspett@silverlaw.com